David L. **WASHINGTON**, Appellant,

v.

**UNITED STATES**, Appellee.

Nos. 97–CO–1799, 97–CF–1801, and 98–CO–16.

District of Columbia Court of Appeals.

Argued Nov. 16, 1999.
Decided Oct. 5, 2000.

---

**31.** The other appellants joined in this argument.

Michael Lasley, Washington, DC, appointed by the court, for appellant. Betty J. Clark, Washington, DC, also appointed by the court, was on the brief for appellant.

Deborah L. Connor, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher, Mary–Patrice Brown, and Lydia Pelegrin, Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, Chief Judge, and TERRY and SCHWELB,* Associate Judges.

TERRY, Associate Judge:

In a one-count information appellant was charged with stalking, in violation of D.C.Code § 22–504(b) (1996). A jury found him guilty as charged. These consolidated appeals are taken from (1) appellant's conviction of stalking (appeal No. 97–CM–1801), (2) the denial of a motion for a new trial (No. 97–CO–1799), and (3) the denial of a motion to reconsider appellant's sentence (No. 98–CO–16). Appellant makes several arguments on appeal, including a claim that the prosecutor made an improper comment in her opening

statement. We agree that the prosecutor's comment was improper, but we are satisfied that it did not generate sufficient prejudice to require reversal. Appellant's remaining arguments are without merit. Accordingly, we affirm both the conviction and the other orders under review.

I

Michelle Hall met appellant in August 1993, and soon the two of them began dating. In September, Ms. Hall testified, "he needed a place to stay and he asked if he could stay for a while." Appellant stayed with Ms. Hall for what turned out to be ten months, from September 1993 until July 1994. Sometime around May 1994, however, appellant and Hall began having "a lot of conflicts," and Hall asked appellant to move out. When he finally moved in July, he took most of his belongings, but "left a few things."

One day in the latter part of August 1994, appellant came to Ms. Hall's house. The two of them chatted for ten or fifteen minutes, and then appellant left. The next morning, however, he came back looking for his key. He asked Hall if she had seen it, and when she replied, "Well, I wasn't looking for your key," appellant slapped her in the face, saying, "You don't talk to me like I'm a punk or a sucker." When Ms. Hall screamed, her daughter came downstairs, and Hall asked her to call her grandmother (Hall's mother), who lived nearby. Appellant left and yelled from the street, "Well, I'll bet you one thing, you won't be living at that address." Ms. Hall was "upset and nervous" after this incident.

Throughout September appellant kept calling Ms. Hall, asking her why she did not want to see him and saying, "You must be messing with some other [man]. I'm going to punish you." Appellant would also come to Hall's home, and when she

---

* *Associate Judge* SCHWELB concurs in the judgment and joins in the court's opinion except for part II–A.

would not open the door, he would yell similar things through the mail slot. At the end of September, after appellant had called "over twenty times," Ms. Hall went to court and filed an application for a civil protection order (CPO). *See* D.C.Code § 16–1005 (1997).[1] She testified that the next morning, when she left for work, she discovered that she had "two slashed tires."[2] On another occasion appellant called Ms. Hall at work and left a message that he wanted her to attend his father's funeral. In addition, he still had his paychecks mailed to Ms. Hall's address. She told him she would leave them in a file cabinet on the porch. When he came one day to pick them up, he began yelling at Hall again through the mail slot. After she refused to let him in, he sat in his car outside her house for fifteen minutes before driving away.

Toward the end of September 1994, Ms. Hall began staying at her mother's house and would go to her own house only if someone was with her. She testified that she did not feel safe in her house because appellant would come there so often. "There would be times I would pull up, and he would come from nowhere and be behind me." Ms. Hall described one incident when she and a female friend from her graduate program at a local university were working on a project at her house. The phone rang, and Hall asked her friend to answer it because "he was calling so often I didn't want to answer the phone." When she learned that appellant was calling, Hall would not speak to him. Five minutes later appellant came to the door, "broke open the storm door . . . banged on the door, turned the knob." Ms. Hall called the police and members of her family, but appellant had left by the time the police arrived.

Appellant came another time in October, pounded on Ms. Hall's new security door,[3]

and then went to the window, yelling about the checks and complaining that he could not see her. In a loud voice, he said that he was going to punish her, then punched his fist through the window and "opened the window trying to come in." Hall once again called the police, but again he left before they arrived.

In May 1995 appellant called Ms. Hall and said he wanted to "atone" for his behavior. Ms. Hall agreed to go to lunch with him, and over lunch "he said that he was trying to get his life together." She said she "wasn't interested in a relationship, could he handle a friendship?" He replied that "a friendship would be fine, and that he didn't want anything else." By the end of June, however, appellant was calling frequently and starting "to be possessive again," asking where Ms. Hall had been and whom she had been with. On Ms. Hall's birthday in July, he called and said he wanted to come and see her. When she told him she "had a few friends over," he acted "real irritated" and said he would not come. However, when she returned from taking some of her friends home, he was waiting on the porch with a gift for her. Ms. Hall did not accept the gift, and appellant left. A few days later appellant came and took back a ring that he had given her the year before.

Appellant continued to call frequently and act possessive. He would come to Ms. Hall's house and stand on the porch "just screaming" at her. On one such visit he asked Hall to go with him to pick up something for his car. After hesitating, she decided to go, thinking it "would be a good day to bring some closure to this." So she wrote a letter stating that she did not want any further communication with him, and when he arrived, the two of them got into her car. As they drove along, she handed him the letter. After he read it,

---

1. The CPO was eventually issued on November 8, 1994.

2. The court promptly instructed the jury to disregard this remark.

3. She had installed a security door to prevent appellant from shouting through the mail slot.

he punched the window of the car and accused her of "talking to him like he was a punk or a sucker." Ms. Hall stopped the car and jumped out and was aided by a bystander.

Soon after this incident, Ms. Hall had her telephone number and her locks changed. Then, in January 1996, she received a letter from appellant. Without opening it, she marked it "Return to Sender" and sent it back. After that, appellant began calling her friends to get her new phone number.

In February 1996, about a week after Ms. Hall returned the letter, appellant appeared in the parking lot outside the school where she taught and yelled to her that he wanted to talk. Hall rushed into the school building, but appellant followed her. He began calling her a "slut" and asking why she did not want to see him on her birthday. She ran to the school office, where a co-worker, Vanessa Johnson, tried to talk to appellant while Hall called the police. Appellant was eventually escorted out of the building by a school security officer and left before the police arrived.

In July 1996 Ms. Hall was riding in her car with a friend, Howard Speight. Appellant saw them stopped at a light and began yelling at Hall that "he was going to mess me up." When the light changed, Hall drove off quickly. Some time after that, in the latter part of 1996, Ms. Hall sought another civil protection order. Finally, in January 1997, appellant was arrested and charged with stalking.

The government presented the testimony of seven other witnesses who corroborated Ms. Hall's testimony in many details. The defense called only one witness, an attorney for whom appellant worked as an investigator, who testified that appellant was on an assignment in the area of Ms. Hall's school in February 1996.

The jury found appellant guilty of stalking. A few days after the trial ended, he filed a motion for new trial, which the court denied. Then, after appellant was sentenced,[4] appellant filed a motion to reconsider his sentence, which was also denied.

II

On appeal appellant presents six arguments: (1) that the trial court erred in refusing to grant a mistrial after the prosecutor made improper comments during her opening statement; (2) that the court erred in excluding evidence that Ms. Hall had filed a previous complaint against appellant which was later dismissed; (3) that the court erred in admitting evidence of a previous civil protection order; (4) that the court erred in refusing to allow recross-examination of Vanessa Johnson; (5) that the court erred in admitting evidence of uncharged criminal conduct; and (6) that the court erred in failing to give a special unanimity instruction. Although the prosecutor's comments to the jury should not have been made, they did not give rise to reversible error. The rest of appellant's arguments are without merit.

A. *The Prosecutor's Comments*

Appellant contends that the trial court erred in not granting a mistrial after the prosecutor made improper comments during her opening statement. What the prosecutor said was this:

Have any of you ever been followed? Have you looked back and felt that someone was watching you? Have any of you ever been called consistently and wanted to hang up because you never wanted to talk to that person? Have any of you had someone show up at church, at your place of business, in front of your home hollering at you, harassing you, and insisting on seeing you? ... What did Miss Hall do to deal

4. The court sentenced appellant to one year in jail (with the last four months suspended), followed by two years of probation, with conditions that he stay away from Ms. Hall, complete a six-month domestic violence program, and pay restitution of $189.00.

with this? Miss Hall did probably what all of us would do if we ever were faced with such an awful situation.

Defense counsel moved for a mistrial at the end of the prosecutor's opening statement, but the court denied the motion.

 The "threshold issue" for this court, in deciding whether to reverse a case because of a statement by the prosecutor, "is whether the challenged remark was improper." *McGrier v. United States,* 597 A.2d 36, 40 (D.C.1991). "Even if it was, a new trial is required only when the defendant suffered 'substantial prejudice' as a result." *Munn v. United States,* 703 A.2d 1239, 1241 (D.C.1997) (citing *Williams v. United States,* 483 A.2d 292, 297 (D.C.1984)). In deciding whether there was "substantial prejudice," this court will consider factors such as "the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error." *Gaither v. United States,* 134 U.S.App. D.C. 154, 172, 413 F.2d 1061, 1079 (1969).

 Our "threshold" inquiry need not detain us long. The prosecutor here was asking the jurors to put themselves in the victim's shoes and playing "upon their own fears of being victimized." *Hart v. United States,* 538 A.2d 1146, 1150 (D.C.1988). The government concedes in its brief on appeal that the remarks were "poorly chosen" and "inartfully phrased." "This court has repeatedly held that it is improper for the prosecutor to employ inflammatory tactics and devices intended to appeal to the passions and fears of the jurors." *Powell v. United States,* 485 A.2d 596, 599 (D.C.1984). That is what the prosecutor did here, and defense counsel appropriately objected to it.

 We must also determine, however, whether "substantial prejudice" to the defendant arose as a result. *Munn,* 703 A.2d at 1241. The remarks were made in the government's opening statement and were not repeated, a fact which lessens the effect of the impropriety. *See Owens v.*

*United States,* 497 A.2d 1086, 1092 (D.C. 1985), *cert. denied,* 474 U.S. 1085, 106 S.Ct. 861, 88 L.Ed.2d 900 (1986) (citing *Frazier v. Cupp,* 394 U.S. 731, 735–736, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969)). Moreover, the evidence against appellant was strong. The government presented eight witnesses, seven of whom corroborated the complainant's testimony in various respects, and the defense was weak. Thus it is reasonable to conclude that the prosecutor's improper remarks at the beginning of her opening statement resulted in minimal prejudice to the defense. Finally, although the trial court did not specifically mention the comment to the jurors, it did instruct the jury that the opening statement was not to be considered as evidence.

Overall, because the challenged remark was made in the opening statement and because the government's case was so strong, we have no basis on which to find "substantial prejudice." We hold that although the prosecutor's comments were improper and should not have been spoken, there was no reversible error in the court's denial of the mistrial motion.

### B. *The Previous Complaint*

 On cross-examination of Ms. Hall, defense counsel sought to elicit that she had filed a criminal complaint against him in 1994 which was later dismissed for want of prosecution. When the government objected, defense counsel told the court at a bench conference that he was trying to show that Ms. Hall was "fabricating, making up all these charges against this man...." The court disallowed the line of questioning as irrelevant. Appellant now argues that this ruling was reversible error.

 This court addressed a similar issue in *Roundtree v. United States,* 581 A.2d 315 (D.C.1990), in which we held that a defendant's right of confrontation under the Sixth Amendment is limited to eliciting evidence that is relevant and probative. *Id.* at 320–321. Evidence concerning the withdrawal of a prior charge is probative

only if it can be shown that the prior charge was false. *Id.* at 321. As we said in *Roundtree:*

> Where an accused seeks to impeach the credibility of a witness by offering evidence that the witness has made a false claim under similar circumstances, the confrontation clause mandates that the trial court give defendant leave to cross-examine about the prior claim only where it is "shown convincingly" that the prior claim is false.

*Id.* (citing *Sherer v. United States,* 470 A.2d 732, 739 (D.C.1983)).

■ In the instant case, the trial court properly barred counsel from asking about the prior charge. Counsel offered no evidence that the prior charge was dismissed because it was false. As the trial court said, there could have been "a zillion other reasons" why the charge was dismissed. Because appellant did not "show convincingly," or in fact at all, that the prior charge was false, the dismissal of that charge was irrelevant,[5] and the court committed no error in keeping it from the jury's knowledge.

C. *The Prior Civil Protection Order*

■ At the government's request, the trial court took judicial notice that a civil protection order had been entered by another judge of the Superior Court in November 1994. Defense counsel objected on the ground that the order had been issued by consent of the parties. After some discussion about the manner in which such orders could be proven, the court said, "I am going to tell the jury that on November 8, 1994, a civil protection order was obtained.... It was agreed to by both parties." Later, in its final instructions, the court told the jury:

> In this case I took judicial notice of the existence of an Intra–Family proceeding filed in the District of Columbia Superior Court ... involving Michelle

Hall as the petitioner and David Washington as the respondent. In that case the parties agreed and consented to entry of a civil protection order which was dated November 8, 1994, and remained in effect for twelve months thereafter. You may, if you choose to do so, regard the fact that this order was in effect during this time period as proven evidence, but you are not required to do so because you are the sole judges of the facts.

Appellant contends that the court erred in taking judicial notice of the order.

In the trial court, appellant argued that the civil protection order was inadmissible because it had been obtained by consent. On appeal, however, he appears to have abandoned that argument, for he now contends only that the order was erroneously brought to the jury's knowledge as an admission of a party opponent. This is not supported by the record; there is no reference in the trial transcript to the order as an admission of any kind.

■ In any event, it has long been settled that a court may take judicial notice of its own records, which is precisely what the trial court did here. *See, e.g., Smith v. Public Defender Service,* 686 A.2d 210, 212 (D.C.1996); *S.S. v. D.M.,* 597 A.2d 870, 880–881 (D.C.1991); *Coleman v. Burnett,* 155 U.S.App.D.C. 302, 313, 477 F.2d 1187, 1198 (1973); *Fletcher v. Evening Star Newspaper Co.,* 77 U.S.App.D.C. 99, 133 F.2d 395 (1942); *cert. denied,* 319 U.S. 755, 63 S.Ct. 1163, 87 L.Ed. 1708 (1943). There can be no serious doubt that the order was relevant to the stalking charge, since it was entered during the period encompassed within the charge and was based on some of the same facts about which Ms. Hall had testified. Under *Miller v. Avirom,* 127 U.S.App.D.C. 367, 369–370, 384 F.2d 319, 321–322 (1967), we have ample reason to reject appellant's present

---

**5.** "There is no constitutional right to present irrelevant evidence." *Gibson v. United States,* 536 A.2d 78, 82 (D.C.1987).

argument because it was not raised in the trial court. But even assuming that the issue was properly preserved for appellate review, it is entirely without merit.

### D. The Denial of Recross–Examination

■■■■■ Appellant claims that the trial court erred in refusing to allow his counsel to recross-examine Vanessa Johnson, a government witness who testified about the encounter at the school. The governing legal principles are clear. "There is no right to recross-examine a witness, provided the scope of any redirect examination is limited to matters raised on cross-examination." *Green v. United States,* 718 A.2d 1042, 1061 (D.C.1998) (citation omitted). In addition, "[w]hether to allow recross-examination is left to the trial court's 'broad discretion.'" *Id.* (citation omitted). Consequently, a decision either to allow or to prohibit recross-examination is reviewed only for abuse of discretion. *Id.* at 1061–1062.

■■■■ On direct examination the prosecutor asked Ms. Johnson how she felt while the incident was going on. She replied, "I felt that I was ready to be involved in some sort of conflict between [appellant and Ms. Hall], and I was thinking of me then." Later, on redirect, the prosecutor asked Ms. Johnson if she felt "threatened" by appellant, and she said, "Yes." Defense counsel then sought permission to ask her on recross whether appellant had actually threatened her, but the court denied the request, saying, "I do not allow recross unless something startling has come up in redirect, and nothing startling or new has come out in redirect.…" The court noted that defense counsel had had an opportunity to ask such a question earlier on cross-examination, but had not done so.

On this record we find no abuse of discretion. After the witness, on direct examination, expressed concern for her own safety, defense counsel could have asked her on cross-examination whether appellant had actually threatened her. But he failed to do so. Since he had no right to recross-examination at all, we see no abuse of discretion in the court's refusal to allow this particular question after counsel had let his earlier opportunity slip by. *See Hilton v. United States,* 435 A.2d 383, 389 (D.C.1981); *Singletary v. United States,* 383 A.2d 1064, 1073 (D.C.1978).

### E. Uncharged Criminal Conduct

Appellant argues that the trial court erred in admitting evidence of uncharged criminal conduct. He contends that four different remarks by witnesses (three by Ms. Hall, one by Ms. Johnson) were improperly heard by the jury and that the cumulative prejudicial effect of these remarks warrants a new trial. We are satisfied that neither the individual remarks nor all of them in combination warrant reversal.

■■■■ On direct examination Ms. Hall was asked, "About how many times during September 1994 would you say you had this type of phone call from the defendant?" After giving her answer, Ms. Hall added unresponsively, "When I left the following morning for work, I had two slashed tires." Defense counsel asked for permission to approach the bench,[6] and at the bench the trial court instructed the prosecutor to keep control of the witness. Immediately after the brief bench conference, the trial court said to the jury, "Ladies and gentlemen, you are instructed to disregard any comments that were just made about the slashing of any tires. Disregard it. Thank you." In a similar situation, this court has held that a curative instruction was sufficient to dispel any prejudice. *See Goins v. United States,* 617 A.2d 956 (D.C.1992). Because the comment was brief and was followed immediately by an instruction to disregard it, we find no reversible error.

6. Counsel, however, did not specifically object to the comment.

■ Ms. Hall also testified that appellant "slapped me in my face" during a visit to her house. Appellant claims that this statement was improperly admitted as evidence of uncharged criminal conduct. *See, e.g., Drew v. United States,* 118 U.S.App. D.C. 11, 15–16, 331 F.2d 85, 89–90 (1964). Defense counsel, however, did not object to this statement at the time it was made, nor did he move to strike it from the record. He must therefore demonstrate that the trial judge committed plain error in failing to exclude the statement *sua sponte. See Watts v. United States,* 362 A.2d 706, 709 (D.C.1976) (en banc) (defining plain error). We conclude that he has not done so. On the contrary, given the strength of the government's case and the weakness of the defense, and assuming for the sake of argument that *Drew* even applies here,[7] we conclude that any possible harm flowing from this comment was "too trivial to worry about." *Scott v. United States,* 619 A.2d 917, 929 (D.C.1993).

■ On direct examination Ms. Hall was asked, "And how did you feel when you heard from your friends that he was calling them to ask for your number; how did you feel about that?" Ms. Hall answered, "I was upset, because I thought at that point he had been incarcerated." On this occasion as well, defense counsel did not make any objection, so appellant must now demonstrate plain error.

In *Clark v. United States,* 639 A.2d 76 (D.C.1993), this court held that a reference to the defendant's previous incarceration, though "problematic," *id.* at 79, did not warrant the granting of a new trial. *Id.* at 80. We said that "insofar as there was no evidence as to what crime may have resulted in appellant's supposed incarceration, the risk of an improper inference of guilt

by the jury was less than in the situation where 'the crime charged and the prior arrest involve the same offense.'" *Id.* at 79. The reasoning of *Clark* applies here as well. In this case Ms. Hall merely mentioned in passing that she thought appellant had been incarcerated. Her comment contained no further information about appellant's incarceration or the crime appellant supposedly had committed. Moreover, the government had a very strong case against appellant. Although the court gave no curative instruction,[8] there was no further mention of appellant's supposed incarceration. We cited several cases in *Clark* involving similar incidents in which it was revealed that the defendant had been incarcerated or had a prior criminal record, but in none of those cases was the conviction reversed. *E.g., Hardy v. United States,* 119 U.S.App.D.C. 364, 365, 343 F.2d 233, 234 (1964), *cert. denied,* 380 U.S. 984, 85 S.Ct. 1353, 14 L.Ed.2d 276 (1965) (witness said he recognized defendant because "we did time in the penitentiary together"). Again, given the strength of the government's case, we find no plain error in the trial judge's failure to intervene *sua sponte.*

■ Finally, on cross-examination Vanessa Johnson testified that appellant "didn't come to school regular." Defense counsel did not object to this statement, which he belatedly challenges on appeal. Since a failure to "come to school regular" is not a crime, there was no error, plain or otherwise.[9]

### F. *The Unanimity Instruction*

■ Appellant argues that the trial court erred in failing to give a special unanimity instruction which differentiated between the "following" and "harassing"

---

7. *But see Toliver v. United States,* 468 A.2d 958, 960–961 (D.C.1983). *See also Bell v. United States,* 677 A.2d 1044, 1047–1048 (D.C.1996) (discussing differences between *Drew* and *Toliver* ).

8. In *Clark* there was no curative instruction because defense counsel rejected several of-

fers by the trial court to give one. *See* 639 A.2d at 80.

9. Appellant also contends that the cumulative prejudicial effect of these statements requires a new trial. This contention is totally without merit.

elements of D.C.Code § 22–504(b),[10] and between "pre-reconciliation" events and "post-reconciliation" events. The court did instruct the jury that it "must unanimously agree either A, that the defendant intended to cause emotional distress to Michelle Hall, or B, that the defendant's conduct placed Michelle Hall in reasonable fear of bodily injury." Appellant argues that the jury should also have been told that it must be unanimous (1) in finding that he either followed or harassed Ms. Hall, since the offense can be committed either by following or by harassing, and (2) in basing its verdict on events occurring either before or after the brief reconciliation in May and June of 1995, on the theory that the evidence showed two discrete series of events. Defense counsel never requested any such instructions, however, and thus appellant cannot win reversal unless he demonstrates plain error. *Parks v. United States*, 627 A.2d 1, 8 (D.C.1993) (failure to request unanimity instruction results in "review [under] the extremely limited plain error standard" (citations omitted)); *see, e.g., Watts*, 362 A.2d at 709 (defining plain error). Under the plain error doctrine, reversal "is justified only in exceptional circumstances where 'a miscarriage of justice would otherwise result.'" *Harris v. United States*, 602 A.2d 154, 159 (D.C.1992) (citation omitted). We find no plain error; indeed, we find no error at all.

 In *Scarborough v. United States*, 522 A.2d 869 (D.C.1987) (en banc), this court held that a special unanimity instruction is required "whenever there is evidence tending to show *legally* separate incidents . . . not just factually separate incidents." *Id.* at 873 (emphasis in original). We went on to say:

> In short, the unanimity issue under a single count of an information or indictment does not turn on whether separate criminal acts occurred at separate times (although in some cases it may); it turns, more fundamentally, on whether each act alleged under a single count was a separately cognizable incident—by reference to separate allegations and/or to separate defenses—whenever it occurred.

*Id.* Thus "[a] unanimity instruction is required where 'a single count encompasses two or more factually or legally separate incidents.'" *Parks*, 627 A.2d at 8 (citing *Gray v. United States*, 544 A.2d 1255, 1257 (D.C.1988)). "The requirement for a special unanimity instruction arises when the court cannot deduce from the record whether the jury must have agreed upon one particular set of facts." *Simms v. United States*, 634 A.2d 442, 445 (D.C. 1993).

In *Schad v. Arizona*, 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991), decided after *Scarborough*, the Supreme Court held that "there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict." *Id.* at 632, 111 S.Ct. 2491. The Court said: "We have never suggested that in returning general verdicts in such cases the jurors should be required to agree upon a single means of commission." *Id.* at 631, 111 S.Ct. 2491. In addition, "[i]t is . . . impossible to lay down any single analytical model for determining when two means are so disparate as to

10. Section 22–504(b) provides in part:
 Any person who on more than one occasion engages in conduct with the intent to cause emotional distress to another person or places another person in reasonable fear of death or bodily injury by willfully, maliciously, and repeatedly *following or harassing* that person, or who, without a legal purpose, willfully, maliciously, and repeatedly *follows or harasses* another person, is guilty of the crime of stalking. . . . [Emphasis added.]

"Harassing" is defined as:
 engaging in a course of conduct either in person, by telephone, or in writing, directed at a specific person, which seriously alarms, annoys, frightens, or torments the person, or engaging in a course of conduct either in person, by telephone, or in writing, which would cause a reasonable person to be seriously alarmed, annoyed, frightened, or tormented.
D.C.Code § 22–504(e).

exemplify two inherently separate offenses." *Id.* at 643, 111 S.Ct. 2491. *Schad* and *Scarborough* differ somewhat in their reasoning, and this court has never addressed the apparent inconsistencies between the two. There is no need to do so here, however, because we conclude that under either *Schad* or *Scarborough* appellant was not entitled to a special unanimity instruction.

### 1. *"Following" or "Harassing"*

The crime of stalking, as the statute makes plain, can be committed either by "following" or by "harassing" the victim. Appellant argues that because there was evidence that he followed Ms. Hall, the trial court should have given a special unanimity instruction on both theories of liability, *i.e.*, that the jury must be unanimous that he either followed or harassed Ms. Hall. There was no error, however, because the government agreed to present its case only on a "harassing" theory, and that is how it went to the jury.[11] Thus, since the jury was never asked or instructed to find appellant guilty of stalking based on "following," the court was not required under either *Schad* or *Scarborough* to give a special unanimity instruction.

### 2. *Pre–Reconciliation and Post–Reconciliation Conduct*

Appellant also argues that the trial court should have given a unanimity instruction on the pre- and post-reconciliation events revealed by the evidence. Stalking, however, is defined as a series of incidents that are part of a course of conduct extending over a period of time. As the government says in its brief, "it is the continuing course of conduct which constitutes the offense, not the individual discrete actions making up the course of conduct." We held in *Gray* that "when a single count is charged and the facts show a continuing course of conduct, rather than a succession of clearly detached incidents, a special unanimity instruction is unnecessary, absent some factor that differentiates the facts on legal grounds." 544 A.2d at 1258. No such factor is present here.

Our opinion in *Gray* differentiates between the two situations that may require a special unanimity instruction. "Incidents have been found to be *factually* separate when separate criminal acts have occurred at different times and were separated by intervening events.... Incidents are *legally* separate when the appellant presents different defenses to separate sets of facts underlying the charge ... or when the court's instructions are ambiguous but tend to shift the legal theory from a single incident to two separate incidents...." *Id.* at 1257 (citations omitted; emphasis in original). Neither definition fits this case. Appellant engaged in a consistent pattern of behavior which amounted to stalking under the statute. Although the events occurred at different times, the statute specifically requires that the behavior be "on more than one occasion" and must occur "repeatedly." D.C.Code § 22–504(b). The charge set forth in the information encompassed a period of almost two and a half years, from August 1994 to January 1997. Thus we cannot say as a matter of law (as we must in order to find plain error) that the acts committed by appellant before the brief reconciliation were "separate criminal acts" from those committed after the reconciliation. Nor did he present separate defenses to these acts; rather, he offered only a limited defense concerning the encounter at the

---

**11.** The court instructed the jury, in pertinent part, as follows:

The essential elements of stalking, each of which the government must prove beyond a reasonable doubt, are, one, that the defendant *harassed* Michelle Hall between on or about August 28, 1994, and on or about January 7, 1997. [Emphasis added.]

The court then defined "harassing" in the language of D.C.Code § 22–504(e), *supra* note 10. There was no comparable instruction on "following."

school, and no defense as to anything else. There was nothing in the judge's instructions to the jury from which anyone could conclude that there were two separate legal theories. Nor was there any legally significant difference between the pre- and post-reconciliation acts. The fact that Ms. Hall chose to have lunch with appellant and agreed to be "friends" with him—a "friendship" which, all too predictably, lasted only a few weeks—does not negate the criminal nature of his previous acts, as appellant suggests.

We hold that appellant's behavior was a continuing course of conduct from the middle of 1994 until his arrest in January 1997, that it constituted a single offense (not two separate offenses), and that he was therefore not entitled to a special unanimity instruction on the pre- and post-reconciliation facts. *See, e.g., Brown v. Ohio,* 432 U.S. 161, 169, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977); *Glymph v. United States,* 490 A.2d 1157, 1160–1161 (D.C. 1985); *Parker v. United States,* 476 A.2d 173, 176 (D.C.1984).

### III

The judgment of conviction and the denial of the motion for new trial are both affirmed. Since appellant has made no claim of error based on the denial of his motion to reconsider his sentence, that ruling is affirmed as well.

*Affirmed.*